AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

SEP 2 0 2019

for the
Western District of Arkansas
Fort Smith Division

DOUGLAS F. YOUNG, Clerk
By _____
Deputy Clerk

| | |
|---|---|
| In the Matter of the Search of | ) |
| Oath Holdings Inc. E-mail accounts: | )   Case No. 2:19 cm 41 |
| remoates@yahoo.com and b_moatessr@yahoo.com | ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe property to be searched and give its location):* Oath Holdings Inc. E-mail accounts remoates@yahoo.com and b_moatessr@yahoo.com; more particularly described on Attachment "A".

located in the Northern District of California, there is now concealed *(identify the person or describe the property to be seized):* See Attachment "B".

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

■ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

■ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. §§ 1956(h) and 1956(a)(1)(A)(ii) | Conspiracy to Commit Money Laundering |

The application is based on these facts:

■ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Reuben K. Gay, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 9/20/19

_____
*Judge's signature*

City and state: Fort Smith, Arkansas

Mark E. Ford, United States Magistrate Judge
*Printed name and title*

AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH & SEIZURE WARRANT

I, Reuben K. Gay, being first duly sworn, state the following is true based upon my personal knowledge, investigation and belief:

**INTRODUCTION**

1.     I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and have been so employed for two years. I am currently assigned to the Little Rock Division of the FBI. In this capacity, I am charged with investigating possible violations of federal criminal law. By virtue of my FBI employment, I perform and have performed a variety of investigative tasks, including functioning as a case agent on white collar crime investigations. I have received training in the conduct of white collar crime investigations. I have also received training and gained experience in interviewing and interrogation techniques, the execution of federal search warrants and seizures and the identification and collection of computer-related evidence. In addition, I have personally participated in the execution of federal search warrants involving the search and seizure of evidence related to white collar crimes.

2.     The information contained in this Affidavit is based on investigations conducted by the FBI and Internal Revenue Service (IRS). The facts set forth in this Affidavit have either been observed directly by your Affiant or related to your Affiant by assisting law enforcement, other law enforcement officers, and witnesses as described herein. Since this Affidavit is submitted only for the limited purpose of securing a search warrant pursuant to Rule 41 of the Federal Rules of Criminal Procedure, I have not set forth each and every fact known to me concerning this investigation. I have included what I believe are the facts sufficient to establish probable cause for the search warrant and orders sought. Dates, times, and amounts are approximate and all financial analyses are ongoing.

3.      Based on the information in this Affidavit, I submit there is probable cause for a search/seizure warrant for certain contents of remoates@yahoo.com and b_moatessr@yahoo.com, email accounts held by Oath Holdings Inc. (formerly Yahoo Holdings, Inc.), an electronic communications provider located in Sunnyvale, California.  The email accounts **remoates@yahoo.com** and **b_moatessr@yahoo.com** (hereinafter also referred to as the "TARGET ACCOUNTS") are more fully described in Attachment A, and the items to be searched, such as fruits, contraband, evidence or instrumentalities of crimes including Conspiracy to Commit Money Laundering in violation of Title 18, United States Code, Sections 1956(h) & 1956(a)(1)(A)(ii), are more fully described in Attachment B.

## PROBABLE CAUSE

4.      William Moates, Jr. (hereinafter "Moates, Jr.") was an investment advisor and owner/operator of Trilennium Financial Alliance, LLC, an investment company located in Fort Smith, Arkansas.  Moates, Jr. solicited and received money from investors by representing that he would use the money to purchase various investment products to include annuities, precious metals, businesses, precious stones, art and automobiles.

5.      An investigation into Trilennium showed that from early-to-mid 2010 until January 2015, Moates, Jr. received investment monies from at least 25 different client investors which were not invested as represented by Moates, Jr.  These monies were instead diverted by Moates, Jr. to his own personal use, to the use of his various businesses, and to pay back other investors. Moates, Jr. was ultimately prosecuted, convicted and sentenced to a term of imprisonment for these crimes.[1] Moates, Jr. is currently serving his sentence at FMC Fort Worth in Fort Worth, Texas.

---

[1] *United States v. William Jackson Moates, Jr.*, 2:16CR20015-001.

6.    In April 2019, Alisha Long, U.S. Probation Officer, Northern District of Texas, (hereinafter "USPO Long") notified Assistant United States Attorney Aaron Jennen (AUSA Jennen) that a recently released inmate from FMC Fort Worth, John Flato[2] (hereinafter "Flato"), provided information regarding Moates, Jr.  According to USPO Long, Flato had stated to her that Moates, Jr. had given Flato written instructions on how to set up a business and use it to launder money. USPO Long told AUSA Jennen that Flato had become acquainted with Moates, Jr. while both men were incarcerated together at FMC Fort Worth. Flato left FMC Fort Worth and was transferred to a halfway house on December 11, 2018, and began serving his term of supervised release on April 8, 2019.

7.    On April 30, 2019, AUSA Jennen received another email from USPO Long, which included a statement from Flato. Flato stated that, while he was incarcerated, Flato told Moates, Jr. that he had a lot of unreported income from importing oil from PEMEX, the Mexican state-owned oil company. The unreported income was in the form of $20 gold pieces kept in a safety deposit box. Moates, Jr. told Flato that as soon as he (Flato) started converting the gold to cash he would be "found out."  Moates, Jr. told Flato that he could show him a way to convert the gold without a trace and no one would know about it if he (Flato) would follow his instructions. Moates, Jr. stated that he was to get a portion of the converted funds for helping Flato. Additionally, Moates, Jr. told Flato that once Flato was successful in converting his unreported income, that Flato could then help Moates, Jr. convert funds that he had hidden.

8.    Before Flato left FMC Fort Worth, Moates, Jr. gave him written instructions to follow (see attached Exhibit A) and told Flato to contact his wife (Rebecca Moates) (hereinafter

---

[2] Flato has multiple prior felony convictions including: Theft Over $1,000 in 1981; Theft over $200 in 1981; Theft by Check in 1982;  Theft in 1984; Theft Over $750 in 1986; Theft and Credit Card Abuse in 1988; Forgery in 1992; Theft of Property in 2005; Theft by Check in 2005; Forgery of a Financial Instrument in 2011; Forger of a Financial Instrument in 2012; and Theft of Government Property in 2014.

"Rebecca") at "remoates@yahoo.com" or his father, William Moates, Sr. (hereinafter "Moates, Sr. (hereinafter "Moates, Sr.") at "b_maotessr@yahoo.com," and they could communicate through his wife or father. The investigation to date shows that Rebecca has been living at an address in Van Buren, Arkansas, which is in the Western District of Arkansas, Fort Smith Division.

9.      On May 13, 2019, Flato was interviewed by law enforcement. Flato stated that he met Moates, Jr. in May 2018 when he was transferred to FMC Fort Worth. Flato stated that he lied to Moates, Jr. about why he was in prison and told him that he was in prison for a scheme involving Mexican oil, and that he had $1.5 million in unreported income in $20 gold coins hidden away. Flato said Moates, Jr. told him that it would "set off bells" when he tried to cash in the gold coins, and provided him with a diagram and written instructions as how to launder the money approximately two weeks before he left FMC Fort Worth (see attached Exhibit A). In exchange for helping Flato launder the funds, he was to pay Moates, Jr. $26,000, which would be deposited into Rebecca's account. Flato stated that Moates, Jr. provided him with three accounts that he claimed to have money hidden in[3]. Moates, Jr. did not tell Flato how much money he had hidden, but suggested that it was more than $5 million. Flato stated that after his release he communicated with Moates, Jr. through Rebecca. Flato stated that they communicated with each other both by phone and by email at remoates@yahoo.com and remoates@icloud.com. Flato stated that he was waiting on Moates, Jr. to explain how to get the CPN, and that Moates, Sr. was supposed to provide him the forms to obtain it. "CPN" is an acronym used for "credit profile number" or "credit privacy number," and is a number that is marketed as an alternative to a Social Security Number when applying for credit. The Federal

---

[3] Flato searched for the account information Moates, Jr. provided him at law enforcement request, but was unable to find it.

Trade Commission advises that CPNs are often associated with credit repair scams.[4] Flato stated that he emailed Moates, Sr., but never received a response. Flato stated that he used his email account at flatoj8@gmail.com to email Rebecca and Moates, Sr.

10.    Inmates, like Moates, Jr., in the Federal Bureau of Prisons system have access to an email application called TRULINCS. Users of the TRUCLINCS system receive this warning:

> This computer system is the property of the United States Department of Justice. The Department may monitor any activity on the system and search and retrieve any information stored within the system. By accessing and using this computer. I am consenting to such monitoring and information retrieval for law enforcement and other purposes. I have no expectation of privacy as to any communication on or information stored within the system.

During this investigation, law enforcement obtained Moates, Jr.'s email communication utilizing TRULINCS.

11.    On March 10, 2019, Rebecca sent an email to Moates, Jr. stating, in part, "You know that resale shop called 'Plato's' closet? A man named John works there……Do you know what I'm taking (sic) about?? He left me a message and said he's a friend and wants to give me his contact info. I don't know if I should do that. I don't know him do you?" Moates, Jr. responded that he couldn't remember who she was referring to and asked for more information. Rebecca responded stating, "Maybe I misunderstood his name. The message sounded like John Plato. He said William Motes gave him my number to leave his contact information. That's all I know. (I was trying to be a little covert but apparently you didn't 'get it'). From now on, if there is someone who is gonna be calling me because you gave them my number, please tell me before hand. Don't give my number out until you've asked me first or at least warned me to expect it. This is the third time it's happened. Hugh, tommy, and now this guy. All three have

---

[4] *Credit Repair Scams*, https://www.consumer.ftc.gov/articles/0225-credit-repair-scams (last visited July 30, 2019).

contacted me out of the blue and I had no clue who they were."

12. On March 11, 2019, Moates, Jr. responded to Rebecca's email from the previous day stating, "I remember now...Yes, I know and remember John at "Plato's". The "P" has a slightly "PH" or "F" sound, buy (sic), yes I remember him...Good friend, and promises made back in December...I am actually surprised he would complete the task and remember me. Let your information be available and maybe we will both be quite surprised..."

13. Based on the above email exchange, it appears that Rebecca and Moates, Jr. were referring to Flato and speaking in code in case their conversation was being monitored. Additionally, your Affiant believes that when Moates, Jr. referred to "promises made," he is referring to the plan with written instructions to launder Flato's unreported income and, later, money he has hidden.

14. Later on March 11, 2019, Rebecca emailed Moates, Jr. with the subject "Plato's closet," stating, "I made contact with the guy who works there. He commented that he was stuck on the 'next step' and had no idea what to do. He also told me he had tried to contact Sr. in December but never heard back. (479)264-3189 He prefers phone rather than email flatoj8@gmail.com Wow that's (sic) expensive. But if he can be of significant help to me and I can sell a lot of clothes to him at the resale store, then phone calls are worth the price...but only if I get good prices for the shoes and clothes I'm taking because our stuff is quality!! No more giving stuff away without getting a good price for it!"

15. Moates, Jr. responded to Rebecca's email stating, "Great...I hoped he would call...He promised me that he would call, and I'll be darned if he didn't follow thru with his word...one of the few that ever have.... I will contact him and then see what he has remaining to accomplish...when all is said and done, he has been looking to spend about $25,000 on some

clothes…Not on "MARKET" clothes, but on the services and tasks that people need when they are going all out to transfer – or take – their Retail Store somewhere else in the world…(not in the US)…He has had stores in the US for many-many years…he is looking forward to seeing what the scenery will be, and how his new place (where-ever (sic) it may be) will work out…. Who know (sic), that is what we might do when I am out as well…."

16.     On March 15, 2019, Rebecca responded to an email with the subject "qwt – 125" stating, "Plato's closet called. Said, that special number you talked about ..it's three capital letters…(the first letter is the first letter of our big boy cats (sic) name. Second letter is the first letter of our cat that died of leukemia…thirds (sic) letter is the first letter of my dads (sic) name). 1. Anyway he said he can't figure out how to go about getting that number. 2. He said he can not email until next Tuesday the 19th when he can reset his password. So between now and then please call. (He acknowledged that was expensive and was taking minutes away from talking to me etc)[.] 3. I think email demo then on will be fine but meanwhile he needs to talk to you. 4. Expressed same concern regarding that number that I told you about. He read the same stuff online that I read. He will definite (sic) tell you or ask you the same concerns I expressed regarding getting it. I told him there is supposedly a legit use of it..??? You explain it, I couldn't."

17.     Your Affiant believes that the "special number" Rebecca is referring to in the email is the "CPN" that Moates, Jr. tells Flato to apply for in the first step of the written instructions he gave him (see attached Exhibit A).

18.     On March 21, 2019, Rebecca sent an email to Moates, Jr. with the subject "Plato's closet" stating, "They called and said they had their email fixed so they can now be contacted that way. I asked if any phone contact had been made but they said it had not…I told them I

didn't know why not but I would be sure to yell (sic) frank that he could now email them. We talked about "cat, cat, daddy" and I reiterated I don't know anything about it but Frank would explain it. I assume frank will want to email them soon. Just thought I'd fill you in." Moates, Jr. responded stating, "I Will call and or email them tomorrow some time...."

19.     Your Affiant believes that in this email, Rebecca and Moates, Jr. are talking about Flato, the instructions Moates, Jr. gave to Flato, and the CPN number.

## BACKGROUND CONCERNING E-MAIL

20.     In general, an e-mail that is sent to a Yahoo subscriber is stored in the subscriber's "mail box" on Yahoo servers until the subscriber deletes the e-mail. If the subscriber does not delete the message, the message can remain on Yahoo servers indefinitely. Even if the subscriber deletes the e-mail, it may continue to be available on Yahoo's servers for a certain period of time.

21.     In my training and experience, I have learned that Yahoo provides a variety of online services, including electronic mail ("e-mail") access, to the public. Yahoo allows subscribers to obtain e-mail accounts at the domain name ymail.com, like the e-mail accounts listed in Attachment A. Subscribers obtain an account by registering with Yahoo. During the registration process, Yahoo asks subscribers to provide basic personal information. Therefore, the computers of Yahoo are likely to contain stored electronic communications (including retrieved and un-retrieved e-mail for Yahoo subscribers and information concerning subscribers and their use of Yahoo services, such as account access information, e-mail transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

22.    A Yahoo subscriber can also store with the provider files in addition to e-mails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to e-mails), and other files, on servers maintained and/or owned by Yahoo.  In my training and experience, evidence of who was using an e-mail account may be found in address books, contact or buddy lists, e-mail in the account, and attachments to e-mails, including pictures and files.

23.    In my training and experience, e-mail providers typically retain certain transactional information about the creation and use of each account on their systems.  This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  In addition, e-mail providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

24.    In my training and experience, in some cases, e-mail account users will communicate directly with an e-mail service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  E-mail providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.  In my training and experience, such information may

constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

25.     This Application seeks permission to search for records contained in the email account further described in Attachment A.  The Search Warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, pursuant to Federal Rule of Criminal Procedure 41(e)(2)(B).

### MARITAL PRIVILEGE

26.     Your Affiant recognizes that based upon Moates Jr. and Rebecca's status as husband and wife, that, notwithstanding the express waiver by utilizing the TRULINCS system, there is the possibility that a search of remoates@yahoo.com may involve the seizure of items subject to the marital privilege. With that understanding, your Affiant advises the Court that the United States intends to use a filter team as well as the following procedures to protect any information that is subject to the marital privilege:

#### Filter Team Practices and Procedures

*Filter Team Membership*

27.     The below members of the filter team are not part of the investigation/prosecution team and never will be so in the future:

a.  An AUSA from the United States Attorney's Office for the Western District of Arkansas; and

b.  One or more Special Agents from the Federal Bureau of Investigation;

c.  One or more Special Agents from the Internal Revenue Service; and

d.  A forensic examiner.

*Basic Procedures Related to the Filter Team Review of Seized Material*

28.     The filter team AUSA shall be responsible for documenting actions and decisions of the filter team (e.g., in a log), including but not limited to: a chain of custody for the emails being searched; a chain of custody for relevant material reviewed pursuant to the procedures set forth below; categorization of relevant material as described below; determinations by the court, if any; and chain of custody of material and items returned to defense counsel, if any.

29.     The filter team shall not disclose the contents of any potentially privileged material to any member of the investigation/prosecution team except as provided below.

30.     The filter team shall err on the side of caution and treat any questionable items as potentially privileged. In addition, filter team members will be familiar with the legal elements of the marital privilege.

31.     During the review process, the filter team AUSA may consult with the investigative agents and/or prosecutors concerning the facts of the investigation, the legal elements of the marital privilege, the scope of the warrants, the appropriateness of the seizure of any document, file, communication, or item, or any other legal question. However, members of the filter team shall not disclose the substance of any potentially privileged item to any member of the investigation/prosecution team except in accordance with procedures outlined below.

32.     Except as provided below for redacted material, the filter team AUSA shall place all material determined to be privileged in a secure container marked "privileged information." The filter team AUSAs shall maintain an electronic or manual log detailing the nature of the documents identified as privileged and the process by which privileged materials were stored and protected.

33.     The filter team will review all seized material except that which could not contain material subject to marital privilege (e.g., communications that include third persons).

*Specific Filter Team Review Procedures for Electronic Storage Devices*

34.     The filter team forensic examiner will work with the filter team AUSA to identify all privileged and potentially privileged material in the email account.

35.     After the filter team has located all privileged and potentially privileged files in the email account, the filter team forensic examiner then will either (1) create copies of the contents of the email account that do not contain any privileged or potentially privileged information, or (2) place the files that do not contain any privileged or potentially privileged information on a new digital media (e.g., a DVD) (collectively "New Media"). This process can be done on a rolling basis. The filter team forensic examiner then will provide the New Media to *another* forensic examiner ("Case Forensic Examiner"), who will be a part of the investigation and prosecution team. The Case Forensic Examiner will work with the investigation/prosecution team to locate material on the New Media that is responsive to the Search Warrant and will testify if the need arises.

36.     The filter team forensic examiner will continue to work with the filter team AUSA and Agents in the review of the privileged and potentially privileged material.

37.     The filter team first will determine whether any of the privileged or potentially privileged material is responsive to the Search Warrant.

38.     For that privileged and potentially privileged material that is not responsive to the Search Warrant, the filter team will not disclose that material to the investigation/prosecution team.

39.     For that privileged and potentially privileged material that is responsive to the Search Warrant, the filter team AUSA will segregate it into three categories: (1) privileged and cannot be redacted; (2) privileged but can be redacted; and (3) potentially privileged (e.g.,

government does not have sufficient information to make that determination or an exception to privilege may apply). The filter team AUSA will send a copy of the material in categories (b) (with proposed redactions) and (c) (collectively "Privilege Review Material") to the Court for review.

40.    The filter team AUSA will seek leave of the Court as to whether the Privilege Review Material: (1) is not privileged; (2) falls within an exception to the privilege; or (3) can be redacted to eliminate the privileged information.

41.    The filter team AUSA only will provide Privilege Review Material to the investigation/prosecution team if the Court has ruled that the filter team AUSA may provide the item to the investigation/prosecution team.

42.    No member of the filter team shall disclose the contents of any potentially privileged material retrieved from the emails to members of the investigation/prosecution team except in accordance with the above procedures.

## CONCLUSION

43.    Based on the aforementioned information, your Affiant believes that there is probable cause to believe that records, documents and communications, as described in Attachment B, are evidence of crimes, including violation of federal law, namely violations of Title 18, United States Code, Sections 1956(h) & 1956(a)(1)(A)(ii), which are contained in the TARGET ACCOUNTS as more fully described in Attachment A.

FURTHER YOUR AFFIANT SAYETH NOT.

Dated this 20 day of September, 2019.

_____

Reuben K Gay
Special Agent
Federal Bureau of Investigation

Sworn and subscribed to me this 20 day of September, 2019.

_____

Hon. Mark E. Ford
United States Magistrate Judge

**Exhibit A**



**Exhibit A (cont'd)**

## John Phlataux Procedure

1. | 1st, you will apply for a CPN for you "Personally"

2. | 2nd you will start/Apply for (2) S-Corp's in the state of Nevada

3. | 3rd you will start/Apply for (1) LLC. from the state of : Nevada

4. | 4th you will Apply for a CPN for your new LLC.

5. | 5th you will now Apply for a Bank Account in the name of the LLC.

6. | With this LLC. and its new Bank Account; Transfer can now start

7. | Be Careful with the "Transfers" (I will explain more later)

✱ ✱ ✱ ✱ ✱ ✱ ✱

Rebecca Moates
remoates@yahoo.com
(479) 769-1274

- or -

Bill Moates. Sr.
b_moatessr@yahoo.com
2323 South "U"
Fort Smith, AR 72901
(479) 769-1276

When you get to a location where you can Contact my father and/or Wife - let them collect and forward your contact information - and then we will start a Conversation - and I will then send you the Completed By-Laws and the Oraznizational Aggreement and the (Corporate/LLC) Resolutions so you will be able to start this process to open an account.